Next case on this morning's docket is the case of Moroni v. Killion. And we have Mr. Eamons and we have Burkhardt. Tom and Karen Burkhardt are the appellees. So Mr. Eamons, you may begin when you are prepared to. My name is Cliff Eamons and I represented the defendants in this case, Mr. and Mrs. Killion. As you are aware, this is an appeal from a judgment in Madison County where Judge Crowder found that there was a violation of the Residential Real Property Disclosure Act and also found that there was a fraudulent misrepresentation. She based her decision on those two theories. I'd like to discuss the fraudulent misrepresentation line first. I think that the case that we cited, the Mitchell case, is instructive on that issue. In Mitchell, the court found that if the respective purchaser was able to discover a possible defect that had not been disclosed to it by the seller, that negates the finding of fraudulent misrepresentation. The court says that a buyer cannot circumvent his or her duty to examine a house by employing a third-party professional and that when that happens, which happened in this case, there was a home inspection report that clearly identified several areas of prior water intrusion into the basement of the house. The claimants testified that they had the inspection made, that the inspection report was provided to them prior to the closing, that it clearly evidenced prior water intrusion, and therefore the fact that they knew that there was prior water intrusion according to the home inspector prior to the closing negates the finding of fraudulent misrepresentation. I think that portion of the order should be overturned. Is there anything in the record to indicate whether the water problems were ever discussed at any time by the parties prior to the actual sale of the property? Yes. I mean, I would think normally if you've got a basement or something that that's going to come up a lot of times in just the general conversation. That's correct. The buyer and seller. What does the record reflect? It reflects, and that is set forth in our section number three. There was a walkthrough. There was a realtor, one of the sellers, Mr. Killian, and one of the buyers, Mrs. Maroney, had a walkthrough of the premises. Apparently, Mrs. Maroney asked Mr. Killian, she apparently had pointed to some pipes up in the ceiling and had seen a little bit of a water stain and asked whether or not that area of the basement had leaked, and I think that Mr. Killian's answer was yes, there had been some leakage there because there were some obvious stains, but that it had no longer leaked. I thought when I read, well, I didn't read the report yet because we don't have it. I don't have it. I thought it said something about this. I thought they were on the walls. The stains are not on the walls. So there were stains on the walls, too. That's where the home inspector, but Mrs. Maroney asked about the stains. Not on the walls? Around the ceiling. Well, it could have been some ceiling pipes and some stains on the upper level of the walls near the ceiling pipes, but the other stains and other evidence of water intrusion that was pointed out by the home inspector were in other areas other than what Mrs. Maroney specifically asked. But wasn't there, wasn't it in dispute what his response was? That's correct, yeah. You mean? Yes, it was. I mean, he, the court found that, well, actually, he didn't. Well, I don't, before what the court found, but didn't he say that he, that no, there wasn't water damage? That's correct. He at first answered that he did not, that he did not tell him that there had not been water damage. Later, I believe that was on direct from the Plains Council, later on cross or redirect or my case, we straightened that out and we asked him, and he didn't remember after he testified the first time that there was, in fact, a conversation related to the question that Mrs. Maroney asked. And what did he tell them? He told them that he, that there had, there was some evidence of water, but that it had all been fixed, that they had not. But didn't the Maroney's contend that he had told them at the viewing that there wasn't water damage? Was there not? Correct, that's correct. Okay, so isn't that a credibility issue for the trier of fact? Absolutely, Your Honor. But that goes to the fraudulent misrepresentation issue. That's where that comes into play. And once the Maroney's are in possession of a home inspection report that notifies them that there has been a prior and there was water, evidence of water damage or water intrusion, then the fraudulent misrepresentation goes away. So you're saying that he could lie about anything if there's, if there is a report that covers, I guess, the subject matter of the fraud. Is that what you're saying? That's what Mitchell says. Okay. That's what Mitchell says, except to the extent that there's concealment. There, you know, in these kind of cases, there's two kinds of situations. One is a, you know, in this case, there was some water intrusion problems, and the Killians thought they had fixed it. The record is clear that 18 months prior to when they first put the house on the market, that Mr. Killian did significant repairs to the property in an effort to fix any water intrusion problems, and that there weren't any for a period of 18 months. But the judge seemed to hone in on the fact that apparently she believed the buyer's report of that, that viewing where they asked about the water damage, and he said no, there had not been any water intrusion. I mean, that from reading the order, that's what it appears. Right. But you're talking about these other efforts they had made to, I guess, correct it. So I want to kind of focus on that. Are you saying that because apparently some water damage was covered in the actual home inspection report, it does not matter what he said in response to a direct question about water damage? That's correct. Under Mitchell? Under Mitchell. Okay. That's a fraudulent misrepresentation. Can be basically wiped away. Wiped away. Well, unless, Mitchell says that unless you conceal something, there are cases that are cited in Mitchell where potential sellers actually covered up things, put new tiles down, put carpet over areas that had damage. They concealed some things. Now, a home inspection report doesn't make those go away. But in this case, there's no concealment. There's no evidence of concealment, no allegations. Concealment isn't like lying then. You're talking about concealment that has to be physical. Correct. That would make it not appear the way it really was. That's correct, yes. Okay. I mean, and that's where the judge made the mistake as far as the fraudulent misrepresentation finding that she made. She didn't take into account Mitchell and the fact that there was a report that notified these buyers of the water intrusion problems, which leads to the Residential Rural Property Disclosure Act finding. Now, that's a little bit different. A seller has a duty to disclose except to the extent that they have a reasonable belief that the problem has been fixed. And that's what the evidence was in this case. Killian put the property up for sale in 1999. Mrs. Killian testified that she insisted that they were actually divorced at the time. Mr. Killian wasn't living at the home. But Mr. Killian comes back to the home and fix and do something about problems that they have with water coming into the basement. The testimony was that Mr. Killian took a faucet off of the back of the house. He tore up a, he completely removed the deck. He tore up and re-poured a concrete patio and sprinkled concrete along the foundation. And this happened in 1999. Eighteen months later was when the Residential Rural Property Disclosure Act form in question was signed. At that time, Mrs. Killian said there weren't any problems for the last 18 months. And so the issue there is that when you sign that form, if you have a reasonable belief that the problem has been fixed, then you are not obligated to disclose that problem. Okay, what if they then inquire about that form and say, well, it says here that you're not aware of any water problem. What about this, you know, water damage I see? And they're inquiring further than, they're asking further questions. I don't think they inquired specifically about the form. The form didn't come up. It wasn't a topic of discussion. You know, in this, in any testimony of anybody. Again, that statement that he made, that the court found that he was not credible on, goes to the fraudulent misrepresentation, not to the Residential Rural Property Disclosure Act. It's the same thing. If you've got a house, you fix the, you know, you've got a leak in the roof. If you fix it, you don't have to tell that buyer that, you know, I had a problem six years ago and I fixed it. That's not what that act says. The act says that you have to disclose material defects in the property that exist at the time you signed the form. Not one month before, five months before, five years before. If you have a reasonable leak that you fixed that problem, then you don't have to disclose it on that form. And I think that there were, the defendant, I mean, the plaintiffs really had no evidence that somehow the Killians, you know, had not fixed it. They didn't have anybody testify that, you know, they inspected the home immediately after the purchase because there was some water coming in. And that we could definitely see that this is a problem that must have existed a month or two before. The only testimony that the plaintiffs had was this expert, Mr. Dawson. Mr. Dawson looked at the property for the first time, four and a half years after the purchase of the property by the plaintiffs. After the plaintiffs had made considerable improvements on the home, including extensive landscaping, removal of trees, ground cover, shrubs. They put a new roof on the house. They put new guttering. They put new siding. They put a new porch or deck on the back. They did a lot of work in the four and a half months before a new retaining wall, before Mr. Dawson even looked at the property. And one of the main points in our brief, I'm sure you've read it, is we really believe that Mr. Dawson's testimony should have been excluded from this case. This, you know, Mr. Dawson's, described himself as a forensic architect. And he testified specifically that his job was to go to his client's home, inspect the home, and then develop a report that would meet the goals of his clients. In this case, Mr. Dawson prepared three separate reports. The first report he prepared indicated that there were $32,342 of damage to this property caused by failure to disclose. The second report, which was two months later, said there was $40,912. The third report that was eight months after that indicated $108,699 of damages. This guy did not do his job, and his testimony should have been excluded. He reviewed some pictures, talked to the plaintiffs that had bought the house, and reviewed some reports. What he didn't do, though, is he didn't talk to anybody who had any knowledge of the condition of the property around the time of the purchase. He didn't see the property for four and a half months later. He didn't talk to the home inspector. He said he didn't need to. He didn't talk to any of the contractors that had done work on the house. Didn't talk to the people that replaced the retaining wall, the roofs, the back patios, that did some plumbing work, that did some electrical work. He didn't talk to anybody to get an idea about what the condition of the property was at the time that the plaintiffs purchased the property. Now, you used two terms, months and years. Was it four and a half years or four and a half months? Four and a half years. Okay. Four and a half years, his first inspection on the property. His failure to do even the basic inquiry into the condition of the home at the time of the alleged injury and the purchase of the home should have precluded his testimony. We cited the Plainfield case and that case indicated, first of all, there was an expert involved there. He was qualified. We don't really, you know, Mr. Dawson is an architect. He has experience in construction and he probably has the qualifications of an expert. But in this case, he didn't do what he needed to do in order to aid the court in its inquiry. His failure to... Doesn't that go to the weight more than, I mean, you just basically have admitted he was qualified to testify as an expert generally. Is that what I understood you to say? Yes. I mean, he is an architect and generally they, if they're on a residential property, they oversee the construction to see that it's in accordance with the blueprints. So... That's correct. I understand where you're coming from. But I think that in this case that his testimony was so speculative, so unreliable because he didn't do the things that an expert should do, that he should not have been allowed to testify because it doesn't aid the court in any of... It doesn't help the court determine what the condition of the property was at the time of the alleged injury, at the time of the purchase and sale of the house. You know, this is, if you look at a case... Did he have an opinion as to what it was at the time of the purchase? Was that question asked? Yeah, I mean, that was part of his report, yes. So therefore, as Judge Chapman said, doesn't it go to the weight of his testimony? That's, I mean, and that's what Judge Crowder, I mean, that's why she allowed him to testify that we did a motion in limine prior to the trial. But again, I think she made a mistake there. You get a medical malpractice case, and a doctor or an expert is going to look at things that occurred at the time of the injury. They're going to look at blood tests and x-rays and MRIs and CAT scans. They're going to look at nurses' records. They're going to look at the doctor's records. They're going to look at things that allow that expert to determine what that patient's condition was at the time of the injury. But didn't he go to the house and examine the house? Four and a half years later. But he didn't talk to anybody that had knowledge. Well, he couldn't have inspected the house the date they bought it. That's correct, but he could have talked to the home inspector who inspected the house a month before they bought it. He could have talked to the roofers that replaced the roof within three or four months after. He could have talked to the people that replaced the retaining wall. And what would have been the purpose? I mean, it seems to me that that would be more in line with what your defense would have been, that something else other than what the original problem caused it. Well, right. And did you have an expert? No, we didn't have an expert. How can you make an opinion if you don't know what the condition was at the time of the alleged injury? And you had an opportunity, though, to learn that condition. Well, it wasn't as you point out. Also, the award was there was no stated basis for the award in the sense that it was within the parameters, I guess, of what was shown as damages, but it wasn't specified as to how the judge arrived at it. So it could have not just been the water damage. It could have been some other damage that they alleged are error or omission in disclosure, such as the electrical. I think that's what it was, Your Honor. I think the basis of the award apparently was water and electrical. And electrical? Apparently. And could not the architect have discerned by looking at the way, apparently there wasn't a whole lot of, he saw electrical extension cords, hardwired, and certainly things that did not sound like had been done by a union. That's correct, Your Honor. Or, you know, a certified electrician. But if you look at the record, the electrical issues are maybe $3,000, maybe $4,000 at the very most. I think there was a $3,000 bill and then an $800 bill of the lows for some electrical stuff, less than $4,000. And that's one of the problems with the decision in this case was, is there was an award given. And I can't, I don't think that plaintiff's lawyers can either, can tell you what made that award up. The court alluded to two things, water intrusion and the electrical in her decision. But if you look at the testimony and you look at the evidence that was admitted, you know, there's no real, I don't know how she came to that number. Well, that's fine. Thank you. You'll have the opportunity for rebuttal. Thank you. Mr. Burkhardt? What about the fact that the award, there's no findings with respect to how the judge arrived at her monetary award? Do you see that as problematic at all? Not as to the result of findings that the court made. But as we cross-appeal in this case, we believe she did not award enough. And we believe, based upon, I believe it appears along this moment in our brief, we delineated all of the items of damage to which there was no opposing, there was no opposing evidence. And each one of them, let me find it real quick. I have it earmarked here. It's on page 50 of our brief, 1551. The total of those damages comes up to $116,355. Defense counsel suggests that we can't show exactly how the court did it. We can't get into Judge Crowder's mind. We filed a post-trial motion on it, and in fact, after adding everything together and coming up with the figures based upon her saying that she probably didn't award the roof, which was replaced because it came with the house, I think she did everything okay, except she forgot the retaining wall. The retaining wall was $19,500. If you add that to the amount she awarded, it comes up to just about everything that she suggests in the order that she found. Did you bring that up in the post-trial motion? Yes, I did. And her response to that? She just affirmed. In the post-trial motion, she just said all post-trial motions are denied. Was there a hearing on it? I believe there was. Ms. Brockert? Yes, ma'am. This was a mistrial? It was tried to a jury, as I recall? It was a hung jury. Okay. So there were jury instructions, I take it, that were? At one point. Yes. And I was trying to think this through in my mind. I guess the jury instructions, the award for the plaintiff, the verdict form, did it delineate what the award, did it break down the award, or was it just a, if you find for the plaintiff, then you award them? You have me on that. I can honestly tell you for sure, my recollection is it was a single line. It was basically a- Not that that in any way spills over to this. I was just trying to think that through. But I can't say for sure. What was the purchase price of the home? Approximately $300,000. And you're claiming the damages are more than the value of the home? The damages are $116,000. I thought she asked for $500,000. That was punitive. Total damages. In arguing to the jury, defense counsel's correct. I posited that it's up to them. But, you know, we have to give you a figure, and this is a figure we think adequately compensates them for all of the anguish that they have gone through in trying to get this house to be the way it was represented to them it should be. And I don't know, and frankly, appealing to this court is honest cross-appeal on the damages issue. I don't dispute that the court has discretion to decide I'm not going to award that, the roof, because, you know, the inspection said it's about a 15, 20-year-old house, and these kind of roofs last 15, 20 years. I'm not arguing with that and with her discretion to be able to do that. But to just award $45,000 when it's obvious that the retaining wall replacement, which was in fact done, the Moronis paid that $19,500. But we don't know whether or not that was part of what she awarded. Well, no, you don't. You can't get into her mind because she didn't clarify that in her second decision. She just denied all the post-trial motions and said she took that all into consideration. It doesn't help, but as I said, if you do the math and you look at what she awarded, what she was looking at, it's caused being things that, number one, we do sign a case that says, you know what, when it's fraud and misrepresentation, you're entitled to all the repairs to get the house to where it should have been as it was represented to you. Well, what I have trouble with on the retaining wall, wasn't it a wooden retaining wall? I'm assuming it was a railroad tie retaining wall. Yes, it was. And it was replaced with a concrete retaining wall. Was there any testimony that would have cost it to replace it with a wood retaining wall? No, there wasn't, and I would have expected the defendant, if he thought there was a better fix for it, to replace that. But you can see the retaining wall when you inspected the property and looked at it the first time and see it was a wooden retaining wall. Correct, but it was found that the wooden retaining wall, obviously it was insufficient to stop the water infiltration. In fact, that wooden retaining wall is what was causing it because it actually facilitated a channel that directed the water straight into where it was coming in through the basement wall. And so it was actually that wall that had to be replaced, and frankly the only replacement that would have been sufficient to stop the leak, as it was proved, because the leak was stopped, was this concrete wall. And that was the proof in the testimony. Mr. Burkhart, and I'm sorry to keep interrupting you, but what Mr. Amon said about the Mitchell case essentially relieving any oral misrepresentation once you have a written, I guess, evaluation or inspection. What is your response to that? Mitchell does not excuse what the Killians did in this case. What the Killians did in this case is intentionally misrepresent that there was no water infiltration, and my clients relied on that. They also basically, if you look at the inspection report and the testimony of the inspector, he was scared to be there. He felt under duress because Mrs. Killian, number one, would not let my client come in the house. He would think my client would have a right to accompany the inspector. But she said, no, no, you're not allowed to be here, and I'm going to call the police on you if you come in, and you can just let the inspector in. Once the inspector was in, he testified that she was crying all the time and basically placing him under a great deal of stress to do it, that there was no lights in the house. What does that mean? Was the electricity turned off? I think maybe she had all the light bulbs unscrewed or something. I don't know. I don't know. But somebody was living in the house? I think she was. According to what was the testimony of the inspector, there were boxes all over the place. You could assume she was preparing to move out upon the sale, but there was stuff all over the place, and the furniture was still there too. And that's the other thing. The furniture can conceal a lot of this stuff, especially that little extension cord coming up through the middle of the living room floor, which is hardwired into the junction boxes. With regard to the electrical, it's like, you know, sometimes you don't need an electrician to know something's wrong. And for Mr. Killian, who has built apartments and been a general contractor in the past, it's just he didn't know what he was doing was wrong. It's unbelievable. But the inspector should have obviously known that was not okay either. Well, the inspector, frankly, may not have done a very good job. And I wondered why they weren't sued, and then I come to find out that there was a relationship. But it doesn't matter, because the other cases state that the inspection, the fact that you have a home inspection does not relieve the homeowner from the obligation to be truthful on the report. The very report makes representations that there is no water, that they're not aware of any water. But he's claiming that the report allows you to make that statement if you think it's been corrected. And that gets to another point. Look at the DVD. It gets to two points. Number one, Dawson's credibility. Dawson didn't do an inspection four and a half years later alone. He looked at all the pictures that were taken just after they moved in. He saw the condition of the house just after they moved in. And what happened just after they moved in? We have a DVD of the water moving across the basement floor. And that's why the judge came to the conclusion it defies logic for the Killians to suggest they didn't know whatever they did. I'm not saying they did it or didn't do it. Well, yeah, I don't think they did anything. But whatever they did, they knew it didn't fix the problem. Because right after my client moves into the house, she's got this stream flowing with the DVD shows, flowing through her basement. What do they say? It didn't rain? No way. That's why the judge made the decision she did. It was clear. The other thing is that Mr. Killian's testimony was completely impeached. I want to get into that a little bit. Here you talk about the circumstances under which Mr. Killian testified all of a sudden about this soda pops thing and how it came up. But he's suggesting that my client was only concerned with these pipes in the ceiling. Nothing could be farther from the truth. What happens is I ask him, and this is Moroni, in my case, ask Mr. Killian, did she ever ask you about this? I knew what my client was going to say. Did she ever ask you whether there was any water problems in the basement? He said no. I don't recall it. That's his first statement. The judge heard that, and it was in the transcript. The next thing is my client says, I did ask you. I was concerned about it because I never had a walkout basement. And I didn't know what to expect. Did you ever have any water in here? And he said no. That was my client's testimony. With his client already having stated that he doesn't recall the recollection, we called Connie, the independent realtor. She was there. She witnessed the conversation. She says, I heard it. I know what was said. And she asked him if you ever had any water problems in this basement. They weren't looking at some pipes. They totally had moved on. You're correct, the water stain was somewhere else in the basement, not on the ceiling tiles. Then after a 90-minute lunch recess, Mr. Killian comes back to the stand and says, oh, yeah, now I remember. Now that he had been totally impeached, now I remember. They did ask me about that, and it had to do with a soda pop stain on the carpet. Never. That's the most incredible thing I've seen witnessed in my 25 years of practice as far as somebody trying to rehabilitate themselves. So, no, Mitchell does not excuse the type of misrepresentation that the Killians did in this particular case. Getting on to my prosecution, I want to talk about the damages. I think it's clear to me that if you look at the amount of each damage, you can relate the subject of that damage to what the court in fact found to have been a violation. Now, you might say all the damages should be awarded because you would never have bought the house, and that was the testimony, if they would have known this was a problem. So anything that you do to try and make the house what you thought it could be should be awarded. I don't know if you were willing to go down that road or not. There's case law to support it. However, I think if you look at the different subject matters and add up all the uncontroverted amounts that that cost, it exceeds the $45,000 that was awarded. And I think it exceeds it. It should have been closer to the $76,000. And that's assuming you take away the roof and other things that maybe the court had a problem with. You can track that out. Whether this court wishes to remand for that purpose or not, I leave to this court's discretion. Attorney's fees. This is one of the things that I've taken several of these house cases. Some are successful, some are not. The court awarded 40,000 in attorney's fees, and we documented over 500 hours, attorney hours, or various hours, attorney and paralegal spend bucks. The fees, there was testimony. I was placed under oath and called to stand. I also submitted an affidavit. There was no question of reasonableness of the necessity of the fees. There was no counter-experts tendered to suggest that the fees were because the amount of time was unreasonable. And I believe I adequately segregated all of my fees, and you can see from the affidavit, is there may have been one or two instances that the court points out in its award, its order, where I have, I failed to segregate a separate insurance case where I was dealing with the same subject matter on the Killian's insurance coverage case. But for the most part, that was all excluded, and you can see that from my affidavit. Was there any, did you testify regarding your affidavit? Yes, I did. I placed myself under oath. Were there any questions from counsel, opposing counsel, regarding? I want to say there was one or two, but not much. I defer to the record on that. But we also called Leonard Burke, who was an attorney who spent some time. He's the one that referred the case to me and had done a little bit of work at the beginning of the case. But in this case, both sides had two attorneys during the trial. It was not an uncomplicated case. Proving fraud never is easy, and we did it. The Consumer Fraud Act, I think, is an act, and I think the case to say this, where the court or legislature has recognized that not always is there going to be a lot in damages, but there's always going to be a lot in attorney's fees, and no lawyer is going to find it economically feasible to keep his or her own life on, i.e. run their business, if they're not going to be adequately compensated for the amount of time that's necessary to bring these claims to light and to stop this type of activity. The Illinois legislature has said, and so has the Supreme Court said, we no longer live in a state where it's buyer beware. Statutorily, we've changed that. A homeowner has to disclose known defects that they're aware of in the house. So it's no longer buyer beware, and we want homeowners, because, frankly, the home is usually the most significant investment that your average middle-class person makes, and these days you're talking about $200,000, $300,000, and someone's going to be paying on that for 20, 30 years. So there are good policy reasons for having this attorney fee shifting statute. I agree that if a judge, I have, again, the award of attorney's fees bears no relationship to the number of hours that were spent by this. Even if you exclude the two lineups, two or three lineups, where I may have mixed up the representation of the killings and the insurance coverage case. What did that amount to, just approximately? It was less than a couple thousand dollars in time. It was not much at all. I think what the judge refers to is one time where we consulted with an attorney, an attorney custodian, and Judge Shiffman, and that was just one 2003 charge that just didn't relate to it. I don't contest that. I missed it. I'm sorry. But for the most part, if you look at my affidavit, all of the time spent is exclusively on this case, and it's for these two counts we were found in favor of. Finally, it's a one-liner. The court declined to award punitives. I understand that that is a discretionary call, but if ever a case calls out for the award of punitive damages, this one does. These people, the killings, not only lied when they were asked about water, they lied when they got on the stand. He did, and it was shown. And such disrespect, trying to weasel their way around, avoid liability, ignores what I consider to be the sanctity and the integrity of the court system. I think punitive damages should have been awarded. Fraud was found. Intentional conduct was found. I don't understand how you don't make some award of punitive damages under those circumstances. Punitive damages are there to help the victim and to dissuade the perpetrator from doing bad conduct that they've done, and I think this calls out for that type of thing. A total award of only $85,000, they have $300,000 in their pocket to absorb that, and I don't think that's fair. So in our process, we asked for the entire award of attorney's fees, which is $116,133.50 based upon an hourly rate of $190. I point out again that there was no question, no testimony, even though the opportunity was afforded to present a rebuttal expert with regard to the fees when necessary or not, and I believe my affidavit was complete. And, you know, like I said, I'm not doing these cases. I'm not sure, you know, that it's fair to discount that much the actual time that was spent in the case. I'm trying to figure if there's anything else. I don't think I have anything further unless the court has questions of me and the... I don't think so, Mr. Burkhart. Thank you for your argument. Mr. Ammons, do you have rebuttal? Your Honors, I'd like to discuss the attorney fee issue. As we raised in our brief, it's our understanding of the law that the court should look to the Miller case that was a residential real property disclosure case and that concluded that the court needs to look to rule 137 factors and determine whether an attorney fee should be awarded. But the court did award attorney fees. Yes, but the court says in the court's orders, the court said that the court has taken into account the area of success, complexity of the issues addressed, and what's fair and reasonable in light of the length of litigation in this matter. Those are not 137 factors. 137 factors are degree of bad faith by the opposing parties, whether the award of fees would deter others from acting under similar circumstances, and the relative merits of the parties' positions. I don't say this frivolously, but they asked for over $600,000, $100,000 in actual damages, $300,000 additional in punitive damages, and over $100,000 of attorney fees. And they were awarded less. First of all, what they asked for was $400,000 in the trial, and they got less than 10%. They won the case. The court decided in their favor. However, I think the law is pretty clear that we have to look at the degree of bad faith. Now, what I think is left in this case is a possible violation of the residential real property disclosure. And in that case, it's not. The court doesn't find fraud. It doesn't find, you know, it had to find that my client's failure to disclose the water intrusion problem was not reasonable. The court must have thought that it wasn't reasonable to think that they had thought they fixed it. Because if they thought they fixed it and it was a reasonable thought, then they answered the question correctly. So, I mean, I think that this, you know, this lying stand, this fraud that Mr. Burkhardt indicates that was present here is just really not the case. You know, the facts of the matter are these people, the day they bought that house, had in front of them a home inspection report that told them that there had been some prior incidents of water intrusion. And they chose to ignore it. They said, well, we don't care. We're getting a really good deal on this house. We're getting this house for $300,000. The record would indicate that it was originally listed at $450,000. And because it had been on the market for so long, the price kept dropping. You know, they got a good deal on this house. And then they came in and they asked, you know, the jury to award them over $100,000 or one-third of the purchase price. So, you know, these people were out a 14-year-old roof that the plaintiff testified that she didn't like the look of. She didn't like the color. And so she replaced it. Well, now my clients were asked to replace that roof for them. So, I mean, for Mr. Burkhardt to indicate that, you know, this is just a case where my clients were lying and caught lying, you know, it's just not the case. You know, my client, there was a conversation seven years prior of a walk-through that took maybe five or ten minutes, and one question that occurred seven or eight years before the trial. This is, you know, Mr. Burkhardt calling my clients a liar and that he was caught to be a liar on the stand. And that's just really not the case. You know, he remembered something after hearing the testimony of the real estate agent. So I don't think this is a case for punitive damages. I think that the court on the attorney fees did not take into account proper factors, and that, you know, that order should be overturned also. Thank you. Thank you, Mr. Raymond, Mr. Burkhardt. And we'll take the matter under advisement.